UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

CHRISTINA MELITO, CHRISTOPHER
LEGG, ALISON PIERCE, and WALTER
WOOD, Individually and on Behalf of All
Others Similarly Situated,

                      Plaintiffs,

     vs.

AMERICAN EAGLE OUTFITTERS, INC., a
Delaware corporation, AEO MANAGEMENT
CO., a Delaware corporation, and EXPERIAN
MARKETING SOLUTIONS, INC.,

                      Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:14-cv-02440-VEC

OBJECTION OF CLASS MEMBERS KARA
BOWES AND BROOKE BOWES TO
PROPOSED CLASS-ACTION
SETTLEMENT, INCENTIVE AWARDS,
AND ATTORNEYS' FEES

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF THE CASE ............................................................................... 3

III.  ARGUMENT ......................................................................................................... 5

    A.   The Proposed Settlement is Inadequate ..................................................... 5

    B.   Class Notice is Inadequate ....................................................................... 14

    C.   The Requested Incentive Awards are Unlawful and Unsupported ........................... 14

    D.   Attorneys' Fees Should be Limited to Class Counsel's Lodestar or 14% of
        the Settlement Fund .................................................................................. 19

        1.   A Lodestar Award is Wholly Appropriate .................................... 19

        2.   The *Goldberger* Factors Weigh against a Generous Fee ............................. 23

IV.   CONCLUSION ..................................................................................................... 25

## TABLE OF AUTHORITIES

## Cases

*Bailey v. Great Lakes Canning, Inc.,*
  908 F.2d 38 (6th Cir. 1990)…………………………………………………...…16

*Baird v. Boies, Schiller & Flexner LLP,*
  219 F. Supp. 2d 510 (S.D.N.Y. 2002)………………………………………...…22

*Barnett v. Equitable Trust Co.,*
  34 F.2d 916 (2d Cir. 1929), *aff'd in part and rev'd in part*
  *United States v. Equitable Trust Co.,* 283 U.S. 738 (1931)…………………….…….22-23

*Boeing v. Van Gemert,*
  444 U.S. 472 (1980)……………………………………………………….…………...…15

*Bosse v. Oklahoma,*
  137 S.Ct. 1 (2016)……………………………………………………………………...16

*Central RR & Banking Co. v. Pettus,*
  113 U.S. 116 (1885)…………………………………………………...………3, 15-16, 23

*Chin v. RCN Corp.,*
  No. 08-7349, 2010 WL 1257586, at *2 (S.D.N.Y. Mar. 12, 2010)………….……...…14

*Cortec Industries Inc. v. Sum Holding LP,*
  949 F.2d 42 (2d Cir. 1991)……………………………………………….……...…9

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448 (2d Cir. 1974)…………………………………………….....…6-8, 11-12, 15

*City of Detroit v. Grinnell Corp.,*
  560 F.2d 1093 (2d Cir. 1977)……………………………………………………………15

*In re Dry Max Pampers Litig.,*
  724 F.3d 713 (6th Cir. 2013)…………………………………………………….....17-18

*Flinn v. FMC Corp.,*
  528 F.2d 1169 (4th Cir. 1975)……………………………………………………...…16

*Ganino v. Citizens Utilities Co.,*
  228 F.3d 154 (2d Cir. 2000)………………………………………………………….…8

*In re Gen. Motors Corp. Engine Interchange Litig.,*
    594 F.2d 1106 (7th Cir. 1979)……………………………………………………..12

*Goldberger v. Integrated Resources, Inc.,*
    209 F.3d 43 (2d Cir. 2000)………………………………………………....20, 22

*Gortat v. Capala Brothers, Inc.,*
    949 F.Supp.2d 374 (E.D.N.Y. 2013)………………………………………….3, 15

*In re Gould Sec. Litig.,*
    727 F.Supp. 1201 (N.D. Ill. 1989)……………………………………………16

*Granada Investments, Inc. v. DWG Corp.,*
    962 F.2d 1203 (6th Cir. 1992)………………………………………….....15

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983)……………………………………………………...22

*Holmes v. Cont'l Can Co.,*
    706 F.2d 1144 (11th Cir. 1983)………………………………………………17

*In re Initial Pub. Offering Sec. Litig.,*
    671 F.Supp.2d 467 (S.D.N.Y. 2009)………………………………………22

*Kavowras v. N.Y. Times Co.,*
    328 F.3d 50 (2d Cir. 2003)…………………………………………………8

*Kincade v. General Tire Rubber Co.,*
    635 F.2d 501 (5th Cir. 1981)………………………………………………16

*McDaniel v. County of Schenectady,*
    595 F.3d 411 (2d Cir. 2010)………………………………………………19-23

*In re Mexico Money Transfer Litig.,*
    267 F.3d 743 (7th Cir. 2001)………………………………………….....6

*Officers for Justice v. Civil Service Comm'n,*
    688 F.2d 615 (9th Cir. 1982)………………………………………………16

*Ortiz v. Chop't Creative Salad Co.,*
    89 F.Supp.3d 573  (S.D.N.Y. 2015)…………………………………………18

*Parker v. Brown,*
    317 U.S. 341 (1943)………………………………………………………8

*Pelzer v. Vassalle,*
    655 Fed.Appx. 352 (6th Cir. 2016)…………………………………………………16

*Perdue v. Kenny A.,*
    130 S. Ct. 1662 (2010)……………………………………………………...19, 23-24

*Plummer v. Chemical Bank,*
    91 F.R.D. 434 (S.D.N.Y. 1981),
    *aff'd,* 668 F.2d 654 (2d Cir. 1982)……………………………………….....17

*Radcliffe v. Experian Information Solutions, Inc.,*
    715 F.3d 1157 (9th Cir. 2013)………………………………………….....17

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014)……………………………………………......4, 12

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
    490 U.S. 477 (1989)……………………………………………………...16

*Saylor v. Lindsley,*
    456 F.2d 896 (2d Cir. 1972)……………………………………………...21

*Shane Group, Inc. v. Blue Cross Blue Shield,*
    825 F.3d 299 (6th Cir. 2016)……………………………………………...18-19

*Silberblatt v. Morgan Stanley,*
    524 F.Supp.2d 425 (S.D.N.Y. 2007)………………………………….....18

*Staehr v. Hartford Fin. Servs. Group, Inc.,*
    547 F.3d 406 (2d Cir. 2008)……………………………………………...…8

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003)……………………………………………....17

*Trustees v. Greenough,*
    105 U.S. 527 (1882)……………………………………………...…3, 14-16

*U.S. Football League v. Nat'l Football League,*
    887 F.2d 408 (2d Cir. 1989)……………………………………………..…22

*United States v. Equitable Trust Co.,*
    283 U.S. 738 (1931)………………………………………………...…..22-23

*United States v. Hatter,*
    532 U.S. 557 (2001)……………………………………………………16

v

*Vassalle v. Midland Funding LLC,*
    708 F.3d 747 (6th Cir. 2013)……………………………………..…..……………………..17

*Wal-Mart Stores, Inc. v. Visa USA, Inc.,*
    396 F.3d 96 (2d Cir. 2005)………………………………………….………6-11, 14

*Weseley v. Spear, Leeds & Kellogg,*
    711 F.Supp. 713 (E.D.N.Y. 1989)……………………………….…………….....16

*Women's Committee for Equal Employment Opportunity v.*
    *National Broadcasting Co.,* 76 F.R.D. 173 (S.D.N. Y.1977)…….….…………….…….….17

*In re Zyprexa Prod. Liab. Litig.,*
    594 F.3d 113 (2d Cir. 2010)…………………………………….....……………15

## Statutes

15 U.S.C.

    §77z-1(7)(A)-(B)………………………………………….…...…13

    §78u-4(a)(7)(A)-(B)………………………………………….....13

    §1692(a)(2)(B)……………………………………….…….....16

28 U.S.C.

    §2072(b)……………………………………….………………16

## Secondary authorities

John Bronstein,
    *Class Action Settlements:  An Opt-in Proposal,*
    2005 U. ILL. L. REV. 903 (2005)………………………………………….....8

Kevin M. Clermont & John D. Currivan,
    *Improving on the Contingent Fee,* 63 CORNELL L. REV. 529 (1978)……………....…20

John C. Coffee, Jr.,
  *Class Action Accountability: Reconciling Exit, Voice, and Loyalty
  in Representative Litigation,* 100 COLUM. L. REV. 370 (2000)............................7, 12

John C. Coffee, Jr.,
  ENTREPRENEURIAL LITIGATION:  ITS RISE, FALL, AND FUTURE
  (Cambridge, Mass.:  Harvard University Press, 2015).......................................20

John C. Coffee, Jr.,
  *Understanding the Plaintiff's Attorney: the Implications of Economic
  Theory for Private Enforcement of Law through Class and Derivative
  Actions,* 86 COLUM. L.REV. 669 (1986).......................................................19-20, 21

James D. Cox,
  *Heroes in the Law:*  Alford v. Shaw, 66 N.C. L. Rev. 565 (1988)...........................21

*Dow Announces Settlement in Urethanes Class Action Litigation,* Feb. 26, 2016,
  http://www.dow.com/en-us/news/press-releases/dow-announces-settlement-in-urethanes-
  class-action-litigation  (visited May 23, 2017)................................................11

Theodore Eisenberg & Geoffrey P. Miller,
  *The Role of Opt-Outs and Objectors in Class Action Litigation:
  Theoretical and Empirical Issues,* 57 VAND. L. REV. 1529 (2004)........................12

Bryan A. Garner, et al.,
  THE LAW OF JUDICIAL PRECEDENT (Thomson West, 2016)...............................16

Stuart C. Gilson & Michael R. Vetsuypens,
  *Creditor Control in Financially Distressed Firms:
  Empirical Evidence,* 72 WASH. U.L.Q. 1005 (1994).......................................10

Sylvia R. Lazos,
  *Abuse in Plaintiff Class Action Settlements:  The Need for
  a Guardian during Pretrial Settlement Negotiations,*
  84 MICH. L. REV. 308 (1985)................................................................21

Margaret H. Lemos,
  *Aggregate Litigation Goes Public:  Representative Suits by
  State Attorneys General,* 126 HARV. L. REV. 486 (2012)..................................22

Lynn M. LoPucki & William C. Whitford,
  *Bargaining Over Equity's Share in the Bankruptcy Reorganization of
  Large, Publicly Held Companies,* 139 U. PA. L. REV. 125, 152 (1990)....................10

NEW YORK STATE,
  REPORT OF THE SPECIAL ADVISORY PANEL ON MEDICAL MALPRACTICE (1976)...........20

Hilary A. Sale,
    *Judges Who Settle,* 89 WASH. U.L. REV. 377 (2011)……………………………….....21

Murray L. Schwartz & Daniel J.B. Mitchell,
    *An Economic Analysis of the Contingent Fees in Personal Injury Litigation,*
    22 STAN. L. REV. 1125 (1970)………………………………………………………...20

Securities & Exchange Commission,
    *Bankruptcy: What Happens When Public Companies Go Bankrupt* (Feb. 3, 2009)
    https://www.sec.gov/reportspubs/investor-publications/investorpubsbankrupthtm.html
    (visited May 23, 2017)……………………………………………………………...…10

Securities Class Action Clearing House,
    *Case Summary: Apollo Group, Inc. Securities Litigation,* April 20, 2012
    http://securities.stanford.edu/filings-case.html?id=103281
    (visited May 23, 2017)…………………………………………………………………11

## I.      INTRODUCTION

This is a class action in which 618,289 class members who received spam texts from American Eagle Outfitters (AEO) have claims under the Telephone Consumer Protection Act ("TCPA") for $500 per text, assuming that AEO's violations were not "willful."  For willful violations, the per-text statutory damages treble, to $1,500 per text.  It appears, moreover, that many class members received not just one, but numerous spam texts.  So, even if AEO did not act willfully, class members' individual claims come to tens of thousands of dollars apiece.  Multiply that by the 618,289 class members to whom AEO is liable, and this is a multibillion dollar case.

Although they say it is a strong case that they likely would win at trial, Plaintiffs and Class Counsel have nonetheless arranged to settle it for just $14.5 million.  That's not a pennies-on-the-dollar settlement.  It's a miniscule-fraction-of-a-cent on the dollar settlement, coming to just $23.45 per class member – no matter how many texts each of them in fact received.  Kara Bowes, for example, can easily document fifty such texts to her cell phone (#████████████), which at $500 per violation establish TCPA claim of at least $25,000.  *See* Kara Bowes Decl. ¶6 & Ex. B.  Brooke Bowes can likewise document 63 such texts to her cell phone (#████████████), which at $500 per violation establish a TCPA claim of at least $31,500.  *See* Brooke Bowes Decl. ¶6 & Ex. B.  Each of these objectors believes she may have received and deleted additional texts that are not reflected in the foregoing exhibits.  *Id*., ¶7; Kara Bowes Decl. ¶7.  And their claims treble if AEO acted willfully.  But Kara Bowes's and Brooke Bowes's TCPA claims – worth upwards of $25,000 apiece – are being settled at just $23.45 per class member.  That's roughly nine one-hundredths of one percent of the $25,000 baseline for Kara Bowes's personal TCPA claims.

Why?  Plaintiffs and Class Counsel offer no good explanation for accepting just $14.5 million to settle a multibillion dollar case.  Quite otherwise – they concede they have a strong case that they believe they could win at trial.  DE252:16.  Their Preliminary Approval Motion speaks of

avoiding some unquantified "risk" of loss.  But the settlement they've proposed ensures class members **will lose** more than 99.9% of their claims' value.  A rational balancing of risks clearly favors proceeding to trial, rather than settling class members' claims for such a miniscule fraction-of-a-cent-on-the-dollar.  But Class Counsel do not want to win the case.  They even argue that winning at trial would be a **bad** thing for the class they supposedly represent, because it might push AEO into bankruptcy, thereby the class with nothing.  That is absurd.  In any bankruptcy reorganization the class would be AEO's largest creditor, and its members could expect to come out as new owners of AEO – an extremely profitable company.

The truth is that the named Plaintiffs and Class Counsel have sold out the class, whose interests they were supposed to represent, for just $23.45 each in the expectation that this Court will award the Plaintiffs $10,000 apiece as "incentive awards" for their nominal "service" to the class, and hand their lawyers $4.8 million in attorneys' fees, amounting to more than twice the value of the lawyer's time on the case.

The divergence between the interests of the nominal Plaintiffs and Class Counsel on the one hand, who would be richly rewarded with incentive awards and attorneys' fee award, and those of the Class they have claimed to represent, could not be more stark.  On the record before this Court, the Proposed Settlement cannot be approved as fair, adequate and reasonable.  *Infra* at 5-14.  Nor can this Court find that the class notice is adequate, as it fails to fairly inform the class of the magnitude of the claims being compromised.  *Infra* at 14.

The incentive awards sought for the named plaintiffs' service as class representatives are particularly disturbing.  The very Supreme Court decisions establishing the common-fund doctrine – under which Class Counsel claim a third of the settlement as attorneys' fees – plainly hold that while named plaintiffs may recover litigation expenses including attorneys' fees, they are not permitted

compensation for their own service to the class.  In *Trustees v. Greenough,* 105 U.S. 527 (1882), the Supreme Court affirmed the award of a named plaintiff's litigation expenses and attorneys' fees, but reversed an incentive award for service to the class, holding that "[t]he reasons which apply to his expenditures incurred in carrying on the suit . . . do not apply to his personal services."  *Id.* at 537. Thus, an incentive payment for service as class representative "was illegally made." *Id.*; *accord Central RR & Banking Co. v. Pettus*, 113 U.S. 116, 122 (1885); *see also Gortat v. Capala Brothers, Inc.,* 949 F.Supp.2d 374, 379 (E.D.N.Y. 2013) (following *Greenough*).  Although Congress has provided for incentive awards in specific limited contexts, Plaintiffs have identified no statutory basis for departing from the rule laid down by the Supreme Court.  *Infra* at 14-19.

If Plaintiffs were likely motivated by illegal incentive awards, Class Counsel doubtless were motivated by their hope for a liberal award of attorneys' fees.  But the poor result they have delivered for the class cannot justify the $4.8 million fee award that they seek for themselves.  Were the Court to approve the Proposed Settlement, it should award Class Counsel no more than their lodestar – with a downward multiplier adjustment to reflect the poor results they obtained.  *Infra* 19-25.

Kara Bowes and Brooke Bowes intend to appear through their counsel, Eric Alan Isaacson or C. Benjamin Nutley, at the Final Approval Hearing scheduled for August 22, 2017.  Counsel anticipates redacting their cell phone number from their public court filings, but will provide those numbers to counsel to the parties herein.

## II.     STATEMENT OF THE CASE

The Telephone Consumer Protection Act ("TCPA") provides for damages of $500 per violation when consumers receive illegal junk phone calls or spam texts.   The Second Amended Complaint explains that class members are "entitled to an award of $500 in damages for each and every Spam Text in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B)."  DE88(SAC¶97).

If the violations can be shown to be willful, class members "are entitled to treble damages of up to $1,500 for each and every Spam Text in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)."

The Settlement Class contains approximately 618,289 members.  DE259:3¶5 (Preliminary Approval Order); DE266:2¶2 (Terrell Decl. ¶2).  Assuming each class member received only one violative text message, and that AEO's misconduct was not willful, the damages would come to $309,144,500.00.  On proof that the defendant's conduct was willful – and it is rather hard to imagine it was otherwise – the class damages would come to three times that – $927,433,500.00. And willfulness, in the context of statutory violations such as this, is a relatively low bar – satisfied by mere reckless disregard.  *See Redman v. RadioShack,* 768 F.3d 622, 627 (7th Cir. 2014).

But even if willfulness could not be proved, most class members doubtless suffered multiple violations.  Three of representative named Plaintiffs allege that they each received "numerous Spam Texts" covered by the litigation.[1]  Class members Kara Bowes and Brooke Bowes each received many such messages and, even after deleting most of them, can produce copies of many dozens. Kara Bowes can readily produce screen caps of fifty.  *See* Kara Bowes Decl. Ex.B.  Brooke Bowes can readily produce screen caps of more than sixty such spam texts.[2]   And each of them likely deleted others.  Kara Bowes Decl. ¶7; Brooke Bowes Decl. ¶7.

So it is readily apparent that AEO's liability runs into the billions of dollars – even if AEO did not act willfully.

But the case has settled, for only $14.5 million.  That is roughly $23.45 per class member. After fees and expenses, "approximately $8,768,206 will be used to pay Settlement Class members." DE88(SAC¶102).  That's roughly $14 for each class member – no matter how many texts they

---

[1] DE88(SAC¶¶32, 40, 64).  The fourth class rep alleges he received multiple spam texts.  DE88(SAC¶¶49-60).

[2] *See* Brooke Bowes Decl. Ex. B.  Brooke Bowes even has a screenshot of her AERewards account showing that she has declined "mobile alerts."  Brooke Bowes Decl. ¶7 & Ex.C.

individually received.  At $500 per violation, Kara Bowes's TCPA claims for fifty some texts would come to $25,000.  Brooke Bowes's claims for more than sixty such spam texts would come to upwards of $30,000 of dollars.  They feel compelled to ask:  How can a settlement that comes to just $23.45 each – and only $14 apiece after attorneys' fees and expenses are deducted – possibly be fair, adequate, or reasonable?

Class Counsel suggest class members who submit claims can expect a bit more than that – because very few class members will take the trouble to submit claims.  As Class Counsel put it: "Plaintiffs estimate that each claimant will receive between $142 and $285, based on a conservative claims rate range of 5% to 10%, which is slightly higher than claims rates in recent TCPA actions." DE252:18 (citing Terrell Decl. ¶35).  But Class Counsel's estimates have inadequate foundation and in other cases have proved notoriously unreliable.[3]  And even $285 is roughly one percent of Kara Bowes's $25,000 baseline of easily demonstrated TCPA claims, and under one percent of Brooke Bowes's easily proved $31,500 baseline.

As set forth herein, they respectfully object to the Proposed Settlement, incentive awards, and attorneys' fees.

## III.   ARGUMENT

### A.   The Proposed Settlement is Inadequate

The inadequacy of a Proposed Settlement that recovers only really the tiniest fraction of one percent of the class members' individual statutory damages should be apparent.  Particularly in light

---

[3] In *Muransky v. Godiva Chocolatier,* S.D. Fla. No. 0:15-cv-60716-WPD, *appeal pending* 11th Cir. No. 16-16486, for example, lawyers prominent among the Class Counsel here – Keith Keogh and Scott D. Owens – estimated in their preliminary approval papers that class members could expect to receive $235 apiece from the $6.3 million settlement. *Muransky*, DE39 at ECF page 17 (Jan. 22, 2016, Motion For Preliminary Approval of Class Action Settlement).  The class notice told the *Muransky* class members: "Class Counsel estimate that a Settlement Class member who submits a valid claim form ('Claim Form') may receive a payment of around $235 subject to pro rata distribution." DE59-1:2 (postcard notice), likely inducing many class members not only to submit claims but also to forego opting out or objecting.  The plaintiffs' lawyers subsequently informed the *Muransky* district court that, in truth, class members who had submitted claims would be receiving only about $60 apiece.  *Muransky*, DE74 at ECF page 16 (September 12, 2016, Motion for Final Approval).

of Keith Keogh's declaration bragging about the results he secures in other cases: "The individual class members' recovery in some of these settlements was substantial.  For example, in one of the cases against a major bank the class members' recovery was 100% of their actual damages resulting in a payout of $l,000.00 to $9,000.00 per class member.  Similarly, in a case against a major lender regarding mortgage servicing responses, each class member who submitted a claim form received $1,431.00."  DE264:8¶23(Keogh Decl. ¶23).

So what went wrong?  Plaintiffs offer no good explanation.

An extraordinarily low settlement sometimes can sometimes be explained by extraordinarily weak claims, since a court evaluating the settlement's adequacy "must ask whether the value of relief in the aggregate is a reasonable approximation of the value of plaintiffs' claim." *In re Mexico Money Transfer Litig.,* 267 F.3d 743, 748 (7th Cir. 2001).  But that cannot be the explanation here, where Plaintiffs' papers attest:  "Plaintiffs and their counsel are confident in the strength of their case and their ability to prevail both at class certification and on the merits."  DE252:16.  With the litigation and discovery conducted so far, moreover, they say "the parties 'have a clear view of the strengths and weaknesses of their cases.'"  DE252:15.  So the case is a strong one, rather than one suitable for settlement for a fraction-of-a-cent-on-the-dollar.

Plaintiffs concede Second Circuit precedent requires this Court to evaluate the "reasonableness of the settlement fund in light of the best possible recovery."  *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974); *accord Wal-Mart Stores, Inc. v. Visa USA, Inc.,* 396 F.3d 96, 117, 119 (2d Cir. 2005); *see* DE252:15 (paraphrasing *Grinnell*).  Yet Plaintiffs and Class Counsel never tell the Court what the best possible recovery is.  They fail to inform the court that this is a multibillion dollar case being settled for a fraction of a cent on the dollar.  That's a strong indication that something is very seriously wrong here.

- 6 -

Plaintiffs' papers say that the Court must consider the risks of further litigation, and Second Circuit precedent confirms that a district court should consider "risks of establishing liability," "risks of establishing damages," "risks of maintaining the class action through trial," and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Wal-Mart,* 396 F.3d at 117 (quoting *Grinnell,* 495 F.2d at 463). So consider the risks of litigation:  How can it be that they warrant a 99.9% discount of class members' claims?  Can it be that Plaintiffs have less than a one percent chance of prevailing?  Surely the odds of winning the case are a lot better than that.  Remember:   "Plaintiffs and their counsel are confident in the strength of their case and their ability to prevail both at class certification and on the merits." DE252:16.

Plaintiffs doubtless will assert that there are exogenous risks to the litigation landscape, such as the challenge to the Federal Communications Commission's rulemaking authority in the *ACA International v. FCC*, D.C. Cir. No. 15-1211, which was argued before the District of Colombia Circuit on October 19, 2016.  Whatever uncertainty the outcome of that appeal might entail, however, it surely does not warrant discounting class members claims by more than 99% in this case.

And it is worth remembering that in consumer class actions like this, it is class counsel who are most risk averse, not the class, whose "members should logically be risk neutral."  John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation,* 100 COLUM. L. REV. 370, 390-91 (2000).  "Across a broad range of cases," Professor Coffee observes, "plaintiffs' attorneys will be more risk averse than class members in considering settlement offers and will wish to accept many offers that the class will rationally wish to reject." *Id.* at 391. Class Counsel's worries about the risks of litigation thus flags potentially serious conflict of

interest between Class Counsel and members of the class, who have very little to lose, and very much to gain, by proceeding to a trial on the merits.[4]

In evaluating the prosed $14.5 million settlement the Court must, of course, consider "the ability of the defendants to withstand a greater judgment." *Wal-Mart,* 396 F.3d at 117; *Grinnell,* 495 F.2d at 463. Plaintiffs say the class should have to accept a settlement of only $14.5 million because "[i]t is likely that AEO would file bankruptcy if a much larger judgment was entered." DE252:16. It is clear, however, that AEO could easily withstand a judgment for far more than this paltry sum.

This Court may judicially notice the fact that American Eagle Outfitters is an extremely profitable company whose market capitalization currently (as of May 23, 2017) is about two billion dollars, and whose shareholders enjoy a 4.5% dividend yield.[5] According to AEO's latest annual report on Form 10-K, which also is judicially noticeable, the company's gross profit for the fiscal year ended January 28, 2017, was over $1.36 billion, and its net income was over $212 million.[6] American Eagle has been paying shareholders a quarterly dividend of twelve-and-a-half cents a share which, with 181,886,000 shares outstanding comes to nearly $23 million per quarter, and more

---

[4] *See id.* ("the bottom line is that this conflict over risk is basic and recurring"); John Bronstein, *Class Action Settlements: An Opt-in Proposal,* 2005 U. ILL. L. REV. 903, 912 (2005) ("accepting an early settlement to avoid the costs and risks of trial makes far more sense for the lawyer than it does for the class members").

[5] *See* Yahoo Finance page for American Eagle Outfitters, ticker symbol "AEO," available online at https://finance.yahoo.com/quote/AEO?p=AEO (visited May 23, 2017); Google Finance page for American Eagle Outfitters, ticker symbol "AEO," available online at https://www.google.com/finance?q=aeo&ei=jj4kWZHuH8aA2Aaa4L_gBw (visited May 23, 2017). This Court is entitled to judicially notice widely reported financial data. *See, e.g., Parker v. Brown,* 317 U.S. 341, 363 (1943) (taking judicial notice "of available data of the raisin industry in California"); *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 166 n.8 (2d Cir. 2000) (same) (stock quotations).

[6] *See* AEO Form 10-K at 34-36, available online from the Securities and Exchange Commission ("SEC") at https://www.sec.gov/Archives/edgar/data/919012/000156459017003969/aeo-10k_20170128.htm (visited May 23, 2017). This Court may judicially notice AEO's SEC filings. *See Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir. 2008); *Kavowras v. N.Y. Times Co.,* 328 F.3d 50, 57 (2d Cir. 2003); *Cortec Industries Inc. v. Sum Holding LP,* 949 F.2d 42, 47-48 (2d Cir. 1991).

than $90 million a year.[7]   Management's Discussion and Analysis of Financial Condition and Results of Operations underscores AEO's financial strength:

> Our Fiscal 2016 performance was strong, as we executed on our key business priorities and strategy.  . . .
>
> . . .  Product cost improvements and expense discipline led to the overall profit increase this year.  ***We ended the year with $378.6 million in cash and no long-term debt***, a 46% increase from $260.1 million in cash last year after the repurchase of 15.6 million shares for $227.1 million.[8]

Plaintiffs' assertion that they had to settle for only $14.5 million because[9] AEO probably "would file bankruptcy if a much larger judgment was entered," DE252:16, is palpably false.  AEO reports that it is extremely profitable, that it has $378.6 million in cash on hand, and that it has no long-term debt.  American Eagle can afford to pay many hundreds of millions of dollars without being forced into bankruptcy.

With its market capitalization of about $2 billion, American Eagle might have trouble paying a judgment of several billion dollars.  But that does not mean that winning such a judgment at trial would be a bad thing for the class, as Plaintiffs intone.  They raise the spectre of AEO's resulting bankruptcy, to argue that "any victory at trial would be hollow, leaving class members with nothing."  DE 252:16.

If we believed a plaintiffs' verdict might induce AEO to file bankruptcy, however, that surely would not leave the plaintiff class empty handed, as Plaintiffs and Class Counsel incorrectly assert.  Even if AEO were to file bankruptcy, the plaintiff class would be its largest creditor.  And since AEO is an extremely profitable company, the plaintiff class could expect to come out of the

---

[7] *See* Form 10-K, *supra* note 6, at 37 (181,886,000 shares outstanding); *id.* at 14 (showing regular quarterly dividends of $0.125 for quarters ended May 2, 2015, through January 28, 2017).

[8] AEO Form 10-K, *supra* note 6, at 21.

[9] *See* AEO Form 10-K, *supra* note 6.

bankruptcy reorganization owning much of the company.  As the SEC has explained, when such a company "emerge[s] from bankruptcy as a viable entity, generally, the creditors and the bondholders become the new owners of the [equity] shares."[10]   In other words, if AEO were induced by a plaintiffs' verdict to file bankruptcy the result would not be a loss for class members – rather, they could expect to come out of the bankruptcy reorganization as the new owners of a highly profitable company.  Even if AEO's major creditors – the plaintiff class the chief among them – chose to leave existing stockholders a small equity stake in AEO, members of the plaintiff class could expect a large ownership interest in a highly profitable company.[11]   Alternatively, the bankruptcy organization might cancel or greatly dilute existing equity and raise cash by selling new shares in a public offering.  Whatever the course chosen, members of the plaintiff class could expect to do quite well in the bankruptcy reorganization.

This is not to say that AEO's first inclination would be to seek such a reorganization in bankruptcy.  Far from it.  AEO insiders' shares and top executives stock options would be cancelled or greatly diluted in a bankruptcy proceeding.   They thus would have strong incentives to avoid bankruptcy by entering a settlement following judgment, on terms extremely favorable to the class.

---

[10] Securities & Exchange Commission, *Bankruptcy: What Happens When Public Companies Go Bankrupt* (Feb. 3, 2009) https://www.sec.gov/reportspubs/investor-publications/investorpubsbankrupthtm.html (visited May 23, 2017); *see also* Stuart C. Gilson & Michael R. Vetsuypens, *Creditor Control in Financially Distressed Firms:  Empirical Evidence,* 72 WASH. U.L.Q. 1005, 1013 (1994) (noting that in reorganizations, the bankrupt companies' "original shareholders' claims are often severely diluted (or eliminated) due to the issuance of a majority of new shares to creditors under [the] firms' bankruptcy reorganization or debt restructuring plans").

[11]  Lynn M. LoPucki & William C. Whitford, *Bargaining Over Equity's Share in the Bankruptcy Reorganization of Large, Publicly Held Companies,* 139 U. PA. L. REV. 125, 152 (1990) (noting that in some reorganizations of publicly traded companies "[b]y allowing [existing] shareholders to retain a part of the equity in the reorganized company, the creditors, who received the major portion of the new shares, sought to ensure that the new shares would be publicly traded and thereby enhanced in value").

Settlements *after* a plaintiffs' class-action verdict are by no means exceptional.[12]   And with a judgment in hand exceeding AEO's total value, the plaintiffs' class could drive a hard bargain.

Instead of seeking to recover the billions of dollars to which the class is legally entitled, named Plaintiffs and their lawyers have thrown in the towel for a miniscule $14.5 million settlement that recovers stunningly little for the class – while, of course, asking the Court to pay the named Plaintiffs $10,000 each, and their lawyers $4.8 million dollars, or more than double their claimed reasonable hourly rates.

The proposed Settlement's recovery of but a fraction of a cent on the dollar for class members' claims amounts to an imposed loss of more than 99% of the value of their claims.   It should be clear:  Class Counsel have placed their own interests before those of the class.

The Second Circuit directs district courts also to consider "the complexity, expense and likely duration of the litigation," and "the stage of the proceedings and the amount of discovery completed."  *Wal-Mart,* 396 F.3d at 117; *Grinnell,* 495 F.2d at 463.  "Federal antitrust cases are complicated, lengthy, and bitterly fought."  *Wal-Mart,* 396 F.3d at 118.  TCPA cases, on the other hand, are relatively simple – did AEO or its agents send unauthorized spam?  We know they did, and can ascertain that the class comprises 618,289 unique phone numbers.  There is not much more to fight about.

The Court also should consider "the reaction of the class to the settlement."  *Wal-Mart,* 396 F.3d at 117; *Grinnell,* 495 F.2d at 463.  Plaintiffs' Preliminary Approval Papers predict that only

---

[12] *See, e.g., Dow Announces Settlement in Urethanes Class Action Litigation,* Feb. 26, 2016, http://www.dow.com/en-us/news/press-releases/dow-announces-settlement-in-urethanes-class-action-litigation     (visited   May   23,   2017) announcing Dow's agreement to settle class-action claims for $835 million after a $1.06 billion jury verdict against it had been affirmed by the Tenth Circuit but before the Supreme Court had an opportunity to act on its petition for certiorari); Securities Class Action Clearing House, *Case Summary:  Apollo Group, Inc. Securities Litigation,* April 20, 2012  http://securities.stanford.edu/filings-case.html?id=103281  (visited May 23, 2017) (securities class action settled after "a $277.5 verdict in plaintiffs' favor" and following denial of the defendants' petition for certiorari); *Case Studies: Apollo Group, Inc.,* http://www.barrack.com/case-studies/apollo-group-inc (plaintiffs' counsel's description of the post-trial settlement) (visited May 23, 2017).

between five and ten percent of the class will even submit claims.  DE252:18 (estimating a "claims rate range of 5% to 10%"); DE266:5¶14 (Terrell Decl. ¶14) (same).   That is hardly a favorable reaction.   "The fact that the vast majority of the recipients of notice [do] not submit claims hardly shows 'acceptance' of the proposed settlement: rather it shows oversight, indifference, rejection, or transaction costs."  *Redman,* 768 F.3d at 628.

Absence of numerous objections and opt-outs does not, in a case like this, evidence support for the Proposed Settlement.  *Id.*   "Acquiescence to a bad deal is something quite different than affirmative support."  *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979).   Indeed, to say "the fact that the vast majority of class members—over 99.99%—have not objected to the proposed settlement or opted out suggests that the class generally approves of its terms and structure" would, as the Seventh Circuit held in *Redman,* require extraordinary naivety.  *See Redman,* 768 F.3d at 629.  Most class members don't have the knowledge, time, and resources to evaluate the Proposed Settlement and lodge an effective objection.[13]

Here, moreover, they lacked the critical information that they needed to fairly evaluate the settlement.  The Class Notice never mentioned the potential value of the claims being released by the settlement.  There is no indication at all that class members are giving up claims for $500 per spam text, assuming AEO did not act willfully, and $1,500 per text if it did.  Class members were afforded no way to judge the amount offered against the potential recovery, because there is no clear description of the damages available.  Neither is there any indication of the potential size of the case

---

[13] "The overwhelming inaction displayed by class members in the reported cases suggests that a class member's failure to opt out should not readily be equated to an affirmative consent to jurisdiction.  Common sense indicates that apathy, not decision, is the basis for inaction." Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 VAND. L. REV. 1529, 1561 (2004). "Class members appear to be behaving out of apathy or rational ignorance rather than making a considered choice not to opt out or object." *d.* at 1563. *See also id*. at 1532, n.8 ("class members overwhelmingly do nothing when provided the option to opt out"); Coffee, *Class Action Accountability, supra,* 100 COLUM. L. REV. at 422 ("'rational apathy' rather than meaningful consent may explain low opt-out rates among class members in most settlement class actions involving 'modest claims and no real alternative because their claims are typically too small to litigate on an individual basis'"].).

as one involving liabilities running into the billions of dollars, in order to permit thoughtful comparison with the $14.5 million offered by the Proposed in Settlement in order to compromise vastly larger claims.

Even in securities class actions, where class members tend to be sophisticated investors, the class notice must contain information allowing class members to evaluate the case's potential value. Statutory provisions governing class notice in such cases require the notice to provide not only a statement indicating the "amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis," but *also* a further statement regarding the *potential* recovery, so that class members can meaningfully evaluate their options.[14] Here, the Class Notice withheld the information that class members needed to truly understand and evaluate the proposed settlement.  Had class members been advised of the staggering gap between the settlement recovery and their potential recovery were the case were taken to trial, many more would have objected that the Proposed Settlement is inadequate.

---

[14] *See* 15 U.S.C. §§77z-1(7)(A)-(B), 78u-4(a)(7)(A)-(B).  The class notice must include:

> (B) **Statement of potential outcome of case**
> (i) **Agreement on amount of damages**
> If the settling parties agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, a statement concerning the average amount of such potential damages per share.
> (ii) **Disagreement on amount of damages**
> If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, a statement from each settling party concerning the issue or issues on which the parties disagree.
> (iii) **Inadmissibility for certain purposes**
> A statement made in accordance with clause (i) or (ii) concerning the amount of damages shall not be admissible in any Federal or State judicial action or administrative proceeding, other than an action or proceeding arising out of such statement.

15 U.S.C. §§77z-1(7)(A)-(B), 78u-4(a)(7)(A)-(B).

The Proposed Settlement is grossly inadequate.  The named Plaintiffs have essentially abandoned class members' substantial claims in order to collect $10,000 in their own pockets as "incentive awards," and $4.8 million in their lawyers' pockets.

### B.    Class Notice is Inadequate

For reasons just stated, it should also be apparent that notice to the class was inadequate. "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."  *Wal-Mart,* 396 F.3d at 113-114. There are "no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *Id.*  Still, notice is adequate only if it fairly apprises class members of their options – including what they are giving up. *Id.*  As just explained, the Class Notice fails that test.

### C.    The Requested Incentive Awards are Unlawful and Unsupported

Plaintiffs' Preliminary Approval Motion acknowledged that courts should "screen[] proposed settlements to determine if they have 'obvious deficiencies, such as unduly preferential treatment of class representatives ... or excessive compensation for attorneys.'"[15] But the $10,000 apiece incentive bonuses that Plaintiffs seek for their "service" compromising other class members claims for just $23.45 apiece, itself amounts to unduly "preferential treatment of class representatives," given the disparity between these amounts.  Though ordinary class members get $23.45 apiece – make that $14 apiece, after deducting attorneys' fees – the named Plaintiffs plan to walk away with $10,000 apiece.

Why they think such awards might be authorized is entirely unclear.  The Supreme Court's decisions establishing the common-fund doctrine – under which Plaintiffs and Class Counsel claim

---

[15] DE252:14 (quoting *Chin v. RCN Corp.*, No. 08-7349, 2010 WL 1257586, at *2 (S.D.N.Y. Mar. 12, 2010) (quoting MCL § 30.41 (3d ed.,1995)).

their "incentive awards" and attorneys' fees – are *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885).  Both decisions clearly hold that a representative plaintiff who procures a common fund benefitting others is entitled to have attorneys' fees and litigation expenses assessed against the fund.[16]  But those decisions equally hold that the named plaintiff **cannot** recover compensation for his own service as class representative.  *See Greenough*, 105 U.S. at 537-38; *Pettus,* 113 U.S. at 122.

*Greenough* specifically condemns as "decidedly objectionable" an incentive award to compensate the named plaintiff, Francis Vose, for services rendered to the class.  *Greenough,* 105 U.S. at 537.  "The reasons which apply to his expenditures incurred in carrying on the suit, and reclaiming the property subject to the trust, do not apply to his personal services and private expenses." *Id*. at 537.  *Greenough* holds that "[s]uch an allowance has neither reason nor authority for its support," and thus is "illegally made." *Greenough,* 105 U.S. at 557-38.  "'It would present,' said Mr. Justice Bradley, speaking for the court, 'too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interests of creditors, and that, perhaps, only to a small amount, if they could calculate upon the allowance of a salary for their time and having all their private expenses paid.'"[17]

---

[16] *See Boeing v. Van Gemert,* 444 U.S. 472, 478 (1980) (following *Greenough* and *Pettus*); *In re "Agent Orange" Product Liab. Litig.,* 818 F.2d 216, 222 (2d Cir. 1987); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir. 1977); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir. 1974); *see also In re Zyprexa Prod. Liab. Litig.,* 594 F.3d 113, 128-29  & nn.67-69 (2d Cir. 2010) (Kaplan, J., concurring).

[17] *Pettus,* 113 U.S. at 122 (quoting *Greenough*); *see also, e.g., Granada Investments, Inc. v. DWG Corp.,* 962 F.2d 1203, 1207-08 (6th Cir. 1992) (applying *Greenough's* distinction between litigation expenses on the one hand, and "personal services and private expenses," on the other); *Crutcher v. Logan,* 102 F.2d 612, 613 (5th Cir. 1939) (under *Greenough* and *Pettus* representative claimants interested in the fund itself can receive "no compensation for personal services"); *Gortat,* 949 F.Supp.2d at 379 (following *Greenough*).

The Supreme Court's decisions are, of course, binding authority until either overruled by the Supreme Court itself, or modified by Congress.[18]  As the Supreme Court has never altered the rule of *Greenough* and *Pettus* proscribing incentive awards, their holdings on the point remain binding authority except where modified by legislation.

And Congress has chosen by statute to authorize incentive awards only in a few very limited contexts.  The Fair Debt Collection Practices Act ("FDCPA"), for example, authorizes an incentive payment "of up to $1,000 for each named plaintiff."  *Pelzer v. Vassalle,* 655 Fed.Appx. 352, 361 (6th Cir. 2016) (citing 15 U.S.C. §1692(a)(2)(B)).  Here, on the other hand, the TCPA makes no similar provision permitting such awards – and this Court cannot imply one.  *See Alexander v. Sandoval,* 532 U.S. 275, 286-87 (2001).

Neither do the Federal Rules of Civil Procedure contain any provision authorizing such an award.   The Rules Enabling Act specifies that the Federal Rules "shall not abridge, enlarge or modify any substantive right."[19]   By the very act of "bringing th[e] action as a class action," moreover, a class representative "has disclaimed any right to a preferred position in the settlement" of the case.[20]  This is important, for it serves to align the interests of the named plaintiffs with the interests of the class they represent.   "Settlements entailing disproportionately greater benefits to named parties are proper only when the totality of circumstances combine to dispel the 'cloud of

---

[18] Where, as here, a decision of the Supreme Court "has direct application," it properly controls. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484 (1989). Even if the high-court precedent "appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.*; *accord, e.g., Bosse v. Oklahoma,* 137 S.Ct. 1, 2 (2016); *United States v. Hatter,* 532 U.S. 557, 567 (2001); *see generally* BRYAN A. GARNER, ET AL., THE LAW OF JUDICIAL PRECEDENT 28-33 (Thomson West, 2016).

[19] 28 U.S.C. §2072(b); *see Amchem Prods., Inc., v. Windsor,* 521 U.S. 591, 613 (1997); *In re Literary Works in Electronic Databases Copyright Litig.,* 509 F.3d 116, 125 (2d Cir. 2007).

[20] *Officers for Justice v. Civil Service Comm'n,* 688 F.2d 615, 632 (9th Cir. 1982); *accord, e.g., Bailey v. Great Lakes Canning, Inc.,* 908 F.2d 38, 42 (6th Cir. 1990); *Kincade v. General Tire Rubber Co.,* 635 F.2d 501, 506 n.5 (5th Cir. 1981); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1175 (4th Cir. 1975); *In re Gould Sec. Litig.,* 727 F.Supp. 1201, 1208-09 (N.D. Ill. 1989); *Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 720 (E.D.N.Y. 1989).

collusion which such a settlement suggests.'"[21]   "'[I]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.'"[22]

Thus, special payments to the class representatives generally provide a strong indication that the class has not been adequately represented, and that a proposed settlement should not be approved.[23]   "[W]e should be most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief."  *In re Dry Max Pampers Litig.,* 724 F.3d 713, 722 (6th Cir. 2013).  Why should the named Plaintiffs care about maximizing other class members' recovery, if ignoring their duty to the class will produce a swift bounty of $10,000 apiece?

That similar awards have in some forums become "common" or even "routine" is entirely beside the point.  The Sixth Circuit has aptly observed that "to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design.  And we have expressed a 'sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'"  *In re Dry Max Pampers,* 724 F.3d 713, 722 (6th Cir. 2013) (citation omitted).  It is time to mow the lawn,

---

[21] *Holmes v. Cont'l Can Co.,* 706 F.2d 1144, 1148 (11th Cir. 1983) (quoting *Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.,* 76 F.R.D. 173, 182 (S.D.N.Y. 1977)).

[22] *Radcliffe v. Experian Information Solutions, Inc.,* 715 F.3d 1157, 1164 (9th Cir. 2013) (quoting *Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 720 (E.D.N.Y.1989)).

[23] *See Plummer v. Chemical Bank,* 91 F.R.D. 434, 442 (S.D.N.Y. 1981) ("[w]hile there may be circumstances in which additional benefits to the named plaintiffs may be justified, such disparities must be regarded as prima facie evidence that the settlement is unfair to the class"), *aff'd* 668 F.2d 654, 660 (2d Cir. 1982); *accord, e.g., Radcliffe,* 715 F.3d at 1163-64; *Vassalle v. Midland Funding LLC,* 708 F.3d 747, 755-56 (6th Cir. 2013); *Staton v. Boeing Co.,* 327 F.3d 938, 977-78 (9th Cir. 2003).

and to recognize the incentive awards in this case for what they are – illegal bounties paid to secure

named plaintiffs' acquiescence in whatever class counsel recommends.

Were Plaintiffs to come up with an authoritative statutory basis for seeking compensation for

their service as class representative in TCPA cases, moreover, they would also have to document

their time on the case in order to justify any such award.  To ensure that incentive awards are "not in

fact a bounty" – or even worse, a bribe – applicants

> must provide the district court with specific documentation – in the manner of
> attorney time sheets – of the time actually spent on the case by each recipient of an
> award.  Otherwise the district court has no basis for knowing whether the awards
> are in fact "a disincentive for the [named] class members to care about the adequacy of
> relief afforded unnamed class members[.]"

*Shane Group, Inc. v. Blue Cross Blue Shield*, 825 F. 3d 299, 311 (6th Cir. 2016) (quoting *Dry Max*

*Pampers,* 724 F.3d at 722).

Here, however, Plaintiffs utterly failed to provide the required documentation.  Their motion

seeking incentive awards asserts:  "Plaintiffs not only informed counsel of the predicate facts, they

also provided counsel with relevant documents in their possession and timely and thoroughly

answered written discovery."  DE268:7.  But all they cite is a paragraph from Class Counsel Beth E.

Terrell's declaration, stating:

> The named Plaintiffs were willing and able to prosecute this case by assisting
> with the drafting of the complaints, providing information regarding their
> interactions with AEO, responding to written discovery, sitting for depositions, and
> testifying at trial. In fact, Plaintiffs all thoroughly responded to multiple sets of
> written discovery and sat for depositions, requiring them to set aside work and
> personal obligations (and in some cases requiring them to travel out- of-state).
> Plaintiffs' support of the settlement is independent of any service award and not
> conditioned on the Court awarding any particular amount or any award at all.

DE266:22¶47.  That is plainly insufficient.  *See Shane Group,* 825 F.3d at 311; *Ortiz v. Chop't*

*Creative Salad Co.,* 89 F.Supp.3d 573, 580-83  (S.D.N.Y. 2015); *Silberblatt v. Morgan Stanley,* 524

F.Supp.2d 425, 435-36 (S.D.N.Y. 2007).

The requested incentive awards should be denied.  That Plaintiffs sought them is powerful evidence that the Proposed Settlement itself is inadequate, unreasonable, and unfair.  *See Shane Group,* 825 F.3d at 311.

**D.     Attorneys' Fees Should be Limited to Class Counsel's Lodestar or 14% of the Settlement Fund**

**1.     A Lodestar Award is Wholly Appropriate**

Class Counsel ask for a 33% fee award, which comes to more than twice their reasonable hourly rates.  Objector respectfully submits that the record does not support such an award.  Were the Court to approve the proposed settlement, however, Class Counsel would be quite "adequately compensated by an award of fees that reflected their normal hourly rates," rather than the 2.3 multiple that they seek.  *McDaniel v. County of Schenectady,* 595 F.3d 411, 412 (2d Cir. 2010).

Construing fee-shifting statutes' references to "reasonable" attorneys' fees, the Supreme Court has repeatedly held that the attorneys' flat lodestar – obtained by multiplying the lawyers' reasonable hourly rates by the hours actually (and reasonably) expended – is presumptively sufficient, and that the presumption is a "strong" one.  *See Perdue v. Kenny A.,* 130 S. Ct. 1662, 1669 (2010) (mandating "a strong presumption that the lodestar is sufficient").  That presumption aptly applies here, where Class Counsel have offered no compelling reason for more generous compensation.  *See McDaniel,* 595 F.3d at 412.  They ought not be rewarded for settling cheaply.

The Second Circuit, while acknowledging a "trend" among district courts toward percent-of-fund awards in common-fund cases, has warned that such percent-of-fund awards encourage counsel to settle too early and too cheaply, in hopes of obtaining substantial multiples of their reasonable hourly rate – thereby maximizing their own welfare at the expense of the class whose interests they are supposed to represent.  *See McDaniel,* 595 F.3d at 419 (citing John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: the Implications of Economic Theory for Private Enforcement of Law*

*through Class and Derivative Actions,* 86 COLUM. L.REV. 669, 717 (1986)).  Despite its apparent

simplicity and ease of application, the percent-of-fund method has "one well-recognized deficiency:

it incentivizes plaintiff's counsel to settle early and perhaps prematurely (in terms of the interest of

the class)."  JOHN C. COFFEE, JR., ENTREPRENEURIAL LITIGATION: ITS RISE, FALL, AND FUTURE 28

(Cambridge, Mass.:  Harvard University Press, 2015).

District courts accordingly retain full discretion to calculate common-fund fee awards by

applying the lodestar method, holding as the Supreme Court has in statutory fee-shifting cases, that

Class Counsel's "time and effort was sufficiently compensated by awarding fees determined by the

attorneys' ordinary hourly rates."  *McDaniel,* 595 F.3d at 415.  Indeed, both *McDaniel* and

*Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 56-57 (2d Cir. 2000), affirmed common-fund

fee awards where counsel were adequately compensated by attorneys' fees amounting to their

reasonable hourly rate for the hours reasonably expended on the case.  *See Goldberger*, 209 F.3d at

57 (petitioners' bid for enhancement beyond lodestar was thwarted by a "concern for

moderation . . . . amplified by our nagging suspicion that attorneys in these cases are routinely

overcompensated for such things as contingency risk.").

Class Counsel suggest that a percent-of-recovery fee award fully aligns their interests with

those of the class, apparently based on the common assumption that a percentage contingent fee

"'gives the lawyer an incentive to get the best possible award or settlement for his client.'"[24]  "This

is simply a misconception.  The lawyer's and the client's economic interests align only partially."[25]

---

[24] Kevin M. Clermont & John D. Currivan, *Improving on the Contingent Fee,* 63 CORNELL L. REV. 529, 536 (1978) (quoting NEW YORK STATE, REPORT OF THE SPECIAL ADVISORY PANEL ON MEDICAL MALPRACTICE 194 (1976)).
[25] Clermont & Currivan, *supra* note 24, at 536; *see also* Murray L. Schwartz & Daniel J.B. Mitchell, *An Economic Analysis of the Contingent Fees in Personal Injury Litigation,* 22 STAN. L. REV. 1125, 1126 (1970) (on the basis of theoretical economic analysis concluding:  "The contingent fee does not necessarily put the lawyer on the client's side or automatically lead him to do what the client would desire if the client could understand the nature of his case and the intricacies of litigation.").

The client's interest is in maximizing the recovery, while the lawyers' interest is in a high rate of compensation relative to the hours invested.[26]

The Second Circuit recognized in *McDaniel* that routinely awarding percent-of fund attorneys' fees encourages premature settlements when lawyers trade a relatively low class recoveries for fees amounting to substantial multiples of their reasonable hourly rates.  Even accepting the notion that in some sense "the percentage method has the advantage of aligning the interests of plaintiffs and their attorneys more fully by allowing the latter to share in both the upside and downside risk of litigation, it can create perverse incentives of its own, potentially encouraging counsel to settle a case prematurely once their opportunity costs begin to rise." *McDaniel,* 595 F.3d 411, 419 (2d Cir. 2010) (citing Coffee, *Understanding the Plaintiff's Attorney, supra,* 86 COLUM. L. REV. at 717).

Judge Friendly observed decades ago, in *Saylor v. Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972), that in class-action and shareholder derivative litigation the interests of attorney and client "are by no means congruent":

> The plaintiff's financial interest is in his share of the total recovery less what may be awarded to counsel, *simpliciter;* counsel's financial interest is in the amount of the award to him less the time and effort needed to produce it.  A relatively small settlement may well produce an allowance bearing a higher ratio to the cost of the work than a much larger recovery obtained only after extensive discovery, a long trial and an appeal.[27]

---

[26] Where attorneys' fees will be based on a percentage of the ultimate recovery, class "counsel's interest in maximizing his fee must be weighed against the costs of spending time on the case.  In many cases the rational goal for class counsel is not to get the biggest fee possible, but to maximize the fee-to-effort ratio."  Margaret H. Lemos, *Aggregate Litigation Goes Public:  Representative Suits by State Attorneys General,* 126 HARV. L. REV. 486, 516 & n.127 (2012).

[27] *Saylor,* 456 F.2d at 900; *see* Hilary A. Sale, *Judges Who Settle,* 89 WASH. U.L. REV. 377, 385 (2011) (noting Judge Friendly's point in an article arguing that federal judges are not adequately scrutinizing class-action settlements); James D. Cox, *Heroes in the Law:*  Alford v. Shaw, 66 N.C. L. Rev. 565, 572 & n.30 (1988) (underscoring Judge Friendly's observations in *Saylor*); Sylvia R. Lazos, *Abuse in Plaintiff Class Action Settlements:  The Need for a Guardian during Pretrial Settlement Negotiations,* 84 MICH. L. REV. 308, 315 & nn.38-39 (1985).

Acknowledging that the percent-of-recovery fee awards are easily calculated and encourage early settlement, the Sixth Circuit warned in *Rawlings v. Prudential-Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir. 1993), that "a percentage award may also provide incentives to attorneys to settle for too low a recovery because an early settlement provides them with a larger fee in terms of the time invested." *Id.* at 516; *see also, e.g., Gascho v. Global Fitness Holdings, LLC,* No. 822 F. 3d 269, 279 (6th Cir. 2016) (quoting *Rawlings*).

This Court should award, at most, Class Counsel's flat lodestar, just as in *McDaniel* and *Goldberger.* If the Court employs a multiplier, it should be a negative downward adjustment, to reflect the poor result obtained.[28]

Ignoring those decisions, Class Counsel insist that "district courts in the Second Circuit have consistently awarded one-third of the fund." DE268:10. Yet the Second Circuit has approved of no such blanket rule. Quite the contrary. The Second Circuit long ago rejected contentions that district courts may adopt such a rule for equitable-fund fee awards: "If there be a rule in the District Court that in such cases allowances shall be made upon a basis of one-third of the amount involved, we do not know it and we disapprove it; it certainly has never had our sanction." *Barnett v. Equitable Trust Co.,* 34 F.2d 916, 919 (2d Cir. 1929). "The allowance is a payment for legal services, not a speculative interest in a lawsuit," the Court explained, as it slashed the district court's fee award from $184,881.08 to just $100,000. *Id.* Noting that the Second Circuit had already "reduced the

---

[28] *See Hensley v. Eckerhart*, 461 U.S. 424, 434-36 (1983); *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 413–14 (2d Cir. 1989) (district court may, in accounting for limited success, either eliminate specific hours or reduce the total award); *Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 525 (S.D.N.Y. 2002) (imposing 60% lodestar reduction from counsel's fee request for poor results: recovery of $37,500 for each of the two plaintiffs was "conspicuously lean" when counsel initially estimated potential damages of $1.25 million, and there was no evidence that defendant changed its practices as a result of the case); *In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467, 515-516 & n.352 (S.D.N.Y. 2009) (reduction in lodestar may be appropriate where, although counsel "obtained a large gross settlement fund," the per-share recovery was only one percent of the loss and the class size and damages were less than anticipated at the commencement of the case, but concluding that prior reduction of the lodestar to under 52% sufficed to reflect the "disappointing" result.).

allowance to $100,000," the Supreme Court held that still was too much, and cut it in half.  *United States v. Equitable Trust Co.,* 283 U.S. 738, 746 (1931).  In *Pettus,* moreover, the Supreme Court ruled that a 10% common-fund fee award was too much, and cut it to just 5%.  *See Pettus,* 113 U.S. at 128.  Here, Class Counsel's lodestar comes to $2,068,562.00, or roughly 14% of the Proposed Settlement fund.  That is ample compensation for their work.  *See Perdue,* 130 U.S. at 1669; *McDaniel,* 595 F.3d at 415; *Goldberger,* 209 F.3d at 56-57.

### 2.    The *Goldberger* Factors Weigh against a Generous Fee

The *Goldberger* case reiterated that, regardless whether a district court chooses the lodestar or percentage method in compensating counsel, the traditional criteria in determining a reasonable common fund fee apply, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir. 2000).

We know from *Perdue* that "the time and labor expended by counsel" is fully compensated by an award of their reasonable hourly rate for the hours they reasonably worked – their lodestar. *See Perdue,* 130 S. Ct. at 1669 (mandating "a strong presumption that the lodestar is sufficient").

Class Counsel say that "the magnitude and complexities of the litigation" support a large fee percent-of-recovery fee award.  DE268:12.  But they've got things backwards when it comes to the case's magnitude, involving hundreds of thousands of identical claims totaling billions in potential liability – for case's character and magnitude ensures that Class Counsel who chose to actually litigate it would enjoy tremendous economies of scale.  As for complexity – the case is not terribly complex.  AEO's agents sent unauthorized spam texts to 618,289 distinct phone numbers.  The statute imposes liability of $500 per text.  The case would get complicated only if Class Counsel

- 23 -

endeavored to prove AEO's willfulness in order to treble the damages.  But that is something Class Counsel never attempted.

Class Counsel cite the "risks of litigation," including the risk of losing at trial, as a reason for a particularly generous fee award.  DE268:13.  Had they born those risks, the argument might carry considerable weight – but they didn't.  They chose to settle rather than risk trial that could have won a multibillion dollar judgment for the class.  Their action, in this regard, is best explained by a conflict of interest – they are risk averse, while the class has little to lose and much to gain by taking the case through trial to judgment.[29]  That the lawyers sold out cheap and early in order to avoid the risks of litigation is no reason for giving them a generous fee.

The relation between the fee and the settlement has been discussed above.  Specifically, the fund in this case represents a minuscule settlement of an enormously large claim, without any serious explanation for why class members should accept so little to release defendants from billions of dollars in liability.  Yet Class Counsel nevertheless want a substantial chunk of that very small fund, without any explanation for how the results justify paying them more than twice what *Perdue* holds their services are worth.

Finally, public interest considerations do not support a higher fee.  *Goldberger*, 209 F.3d at 51 (recognizing "a commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest").  This case has not served the public interest.  There is no indication that defendant has made any practical change to its marketing practices, or otherwise altered its conduct, as a consequence of the case or the settlement.  Kara and Brooke Bowes have continued to receive spam texts even after the Proposed Settlement received this

---

[29] *See* John C. Coffee, Jr., *Class Action Accountability, supra,* 100 COLUM. L. REV. at 390-9; John Bronstein, *Class Action Settlements, supra* note 4, 2005 U. ILL. L. REV. at 912 ("accepting an early settlement to avoid the costs and risks of trial makes far more sense for the lawyer than it does for the class members").

Court's preliminary approval.  *See* Kara Bowes Decl. ¶6 & Ex.B; Brooke Bowes Decl. ¶6 & Ex.B. Defendants obviously have no disincentive to discontinue the alleged practices:  there is no injunction, and the total monetary amount of the settlement is a pittance to American Eagle, relative to the revenues it obtains by its business practices.

That is particularly true when the huge liabilities it incurs from violating the TCPA can be extinguished by a settlement for a fraction of a a penny on the dollar.  Only two conclusions are possible: either there was never wrongful conduct against the public interest in the first place or, if there was, this case has not stopped it and instead will release momentous liability in exchange for a trivially small payment to class members and a hefty fee award to their lawyers.  There is nothing "in the public interest" about that.

## IV.     CONCLUSION

For all the foregoing reasons, the Proposed Settlement should be disapproved as unfair, unreasonable, and inadequate; the class notice should be ruled inadequate, the named Plaintiffs' proposed incentive awards should be denied as unauthorized, unsupported, and contrary to sound policy; and any attorneys' fee award should be limited to Class Counsel's lodestar, most appropriately with a downward adjustment to reflect the poor results obtained.


DATED:  May 24, 2017                          Respectfully submitted,



                                              LAW OFFICE OF ERIC ALAN ISAACSON
                                              ERIC ALAN ISAACSON


                                              _____
                                              Eric Alan Isaacson
                                              [pro hac vice application pending]

6580 Avenida Mirola
La Jolla, CA    92037-6231
Telephone:  858-263-9581
ericalanisaacson@icloud.com

C. BENJAMIN NUTLEY, ATTORNEY
C. BENJAMIN NUTLEY
   [pro hac vice application pending]
1055 E. Colorado Blvd., 5th Floor
Pasadena, CA    91106
Telephone:  626-204-4060
nutley@zenlaw.com

Attorneys for Class Member Objectors Kara M.
Bowes and Brooke Bowes